UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

**UNITED OF OMAHA LIFE**
**INSURANCE CO.,**
    **- Plaintiff**

    **v.**                                    **CIVIL NO. 3:08-CV-1190 (TPS)**

**CONNECTICUT STUDENT**
**LOAN FOUNDATION,**
    **- Defendant**

**RULING AND ORDER ON PLAINTIFF'S MOTIONS**
**FOR A DEFICIENCY JUDGMENT AND FOR A PREJUDGMENT REMEDY**

On April 6, 2010, this Court held an evidentiary hearing on the plaintiff's motions for a deficiency judgment [dkt. #41] and for a prejudgment remedy [dkt. #47]. Two expert witnesses testified and numerous documents were received into evidence. Based on the credible evidence, the plaintiff's motions for a deficiency judgment and for a prejudgment remedy are both **GRANTED** in the amount of **$495,846.89**[1].

**I.   Introduction**

On or around October 20, 1989, the defendant, Connecticut Student Loan Foundation ("CSLF"), obtained a $6,500,000 loan from the plaintiff, United of Omaha Life Insurance Company,[2] as

---

[1] This figure was calculated using the computation formula found on page 2 of the plaintiff's motion for deficiency judgment. The Court has replaced the plaintiff's expert's valuation of the subject property with its own.

[2] On March 30, 2009, United of Omaha Life Insurance Company ("United") assigned the promissory note and mortgage to UM

evidenced by a promissory note.  (Am. Compl. 2.)  As of that same date, CSLF became the owner of the subject property located at 525 Brook Street in Rocky Hill, Connecticut.  CSLF secured the loan and its obligations under the promissory note by giving UM a mortgage that encumbered CSLF's interest in the subject property.  In April 2008, CSLF defaulted on its obligations to UM under the promissory note and the mortgage due to its "failure to timely and fully pay the principal, interest and/or other sums due under the Note and/or Mortgage." (Am. Compl. 3.)  Consequently, UM exercised its option to accelerate the note and declare the entire balance due under the note and mortgage.  Id.

After conducting a hearing on August 17, 2009, the Court concluded that CSLF was indebted to UM in the amount of $5,244,761.99.  [See dkt. #35.]  On August 19, 2009, the Court entered a judgment of strict foreclosure with a law day of September 17, 2009.  [See dkt. #36.]  CSLF failed to exercise its equity of redemption on its law day.  (See Pl.'s Mot. Def. Judg. 1.)  Accordingly, title to the subject property vested absolutely in the plaintiff on September 18, 2009.  Id.

The dispute at the heart of the pending motions is the value of the subject property on the date that title to the subject property vested in the plaintiff.  The plaintiff asserts that the

---

Holdings, LLC ("UM").  (See Pl.'s Mot. Subst. Party 1.)  On April 23, 2009, the Court substituted UM in place of United as the plaintiff in this case.  [See dkt. #27.]

subject property was worth $2,925,000 on that date.  <u>Id.</u>  This figure is less than the amount of the defendant's debt, as the Court calculated on August 17, 2009.  Consequently, the plaintiff seeks a deficiency judgment in the amount of $2,410,236.39, a figure that reflects not only the defendant's debt and the plaintiff's appraisal of the subject property, but also various fees, costs, and taxes.  <u>Id.</u> at 2.  The defendant, however, objects to the plaintiff's valuation of the subject property.  (<u>See</u> Def.'s Obj. Mot. Def. Judg. 1.)

Both parties requested an evidentiary hearing.  The plaintiff sought to establish the value of the subject property so that a deficiency judgment could be entered in accordance with that valuation.  (<u>See</u> Pl.'s Mot. Def. Judg. 2.)  The defendant sought to "offer substantive testimony in contradiction" of the value that plaintiff's appraiser has heretofore ascribed to the subject property.  (<u>See</u> Def.'s Obj. Mot. Def. Judg. 1.)  The plaintiff also moved for a prejudgment attachment of the subject property.  (<u>See</u> Pl.'s Mot. PJR 1.)

**II.  The Standard for Entry of a Deficiency Judgment**

Connecticut General Statute §49-14 dictates that the Court shall hold an evidentiary hearing once any party to a mortgage foreclosure files a motion seeking a deficiency judgment.  CONN. GEN. STAT. §49-14 (2009).  At such hearing, the Court "shall hear the evidence, establish a valuation for the mortgaged property and

shall render judgment for the plaintiff for the difference, if any, between such valuation and the plaintiff's claim." Id. Indeed, "[i]n the hearing contemplated under §49-14 to obtain a deficiency judgment, the court, after hearing the party's appraisal, determines the value of the property and calculates any deficiency." Bank of Boston Conn. v. Moniz, 47 Conn. App. 234 (1997). "The deficiency judgment procedure presumes the amount of the debt as established by the foreclosure judgment and merely provides for a hearing on the value of the property." First Bank v. Simpson, 199 Conn. 368, 373 (1986). The deficiency hearing concerns the fair market value of the subject property as of the date title vests in the foreclosing plaintiff. Eichman v. J&J Building Co., 216 Conn. 443, 445 (1990).

## III. Discussion

The plaintiff asserts that the subject property was properly valued at $2,925,000 on the date that title vested absolutely in UM. The defendant disputes this appraisal. At the evidentiary hearing on April 6, 2010, each party called an expert witness to testify to the value of the subject property on the date in question. The crucial issue for the Court to decide, therefore, is the proper valuation of the subject property on September 18, 2009.

### A.   Patrick A. Lemp for the Plaintiff

Appraiser Lemp, who has worked as a commercial real estate appraiser for the past seventeen years, estimated that the market

4

value of the subject property was $2,925,000 on September 18, 2009. Lemp used both the sales comparison and income capitalization approaches to arrive at this figure.  Specifically, Lemp used a discounted cash flow analysis as part of his income capitalization approach in order to arrive at a final conclusion as to the value of the subject property.  On September 18, 2009, Lemp inspected the interior and exterior of the subject property for approximately one hour and described the property's physical condition as "average to good."  In addition to conducting a physical inspection of the property, Lemp also reviewed Rocky Hill town hall records, requested and reviewed all historical information from the building's former owner, examined the property's leases, and researched the marketplace "to get an understanding of the current market conditions and where the subject property fits into that marketplace."

Lemp compared the subject property to five comparable sales. Because the market "started to really implode" due to a credit crisis in mid-2007, there were very few sales in 2009.  Indeed, Lemp testified that it was "very difficult to go out and acquire property" because of the layoffs, downsizing, and lack of growth in the commercial real estate marketplace.  Consequently, Lemp was "forced to take a look at some older transactions that [he deemed] to be comparable to the property."  Lemp confirmed that the "general recurring theme" from other brokers was that there was

very little activity in the marketplace, so older leases needed to be considered when making the appraisal.

It is important to consider the price per square foot of the five comparable sales Lemp analyzed. Comparable Sale No. 1, located at 20 Security Drive in Avon, Connecticut, was sold at $42 per square foot of gross building area ("GBA"). Comparable sale No. 2, located at 17 Talcott Notch Road in Farmington, Connecticut, was sold at $88 per square foot of GBA. Comparable sale No. 3, located at 160 Bridge Street in East Windsor, Connecticut, was sold at $75 per square foot of GBA. Comparable sale No. 4, located at 86 Hopmeadow Street in Simsbury, Connecticut, was sold at $90 per square foot of GBA. Comparable sale No. 5, located at 43 Western Boulevard in Glastonbury, Connecticut, was sold at $73 per square foot of GBA.

On cross-examination, Lemp admitted that 20 Security Drive sold at a price that was "substantially lower than the other four comparable sales." The Court finds this figure surprising, as Lemp appraised the subject property in February 2009 using the same comparable sales, save the 20 Security Drive property, and concluded that the subject property was worth only $2,660,000. Lemp, therefore, *increased* his estimate of the subject property's value by $265,000 despite adding a new comparable sale to his analysis that sold for roughly half the price of the other four comparable sales. Lemp attempted to explain this counterintuitive

result by pointing out that 20 Security Drive had been financed at an unusually high interest rate -- 17% -- which negatively affected its market value. Nevertheless, Lemp provided a definition of market value that includes the following language: "[t]he price represents the normal consideration for the property sold unaffected by special or creative financing . . ." Yet it appears that Lemp included a comparable sale in his appraisal that featured special and creative financing. The inclusion of 20 Security Drive, therefore, casts doubt as to whether the market value that Lemp ascribes to the subject property is the product of "normal consideration" of its value. At the very least, the inclusion of 20 Security Drive -- the one comparable sale that Lemp did not consider in his February 2009 appraisal -- impairs the credibility of Lemp's September 2009 appraisal. Indeed, Lemp testified that the "market was frozen," that "leasing was bad," and that there was "limited market data." In light of such poor real estate conditions, Lemp's decision to supplement his February 2009 appraisal with only this creatively-financed property does not inspire the Court's trust.

While Lemp estimated that the subject property was worth $2,925,000 on September 18, 2009, he also noted that on October 1, 2008, the Town of Rocky Hill assessed the fair market value of the subject property at $5,561,600 for taxation purposes. Lemp emphasized that Rocky Hill assessed the subject property higher

7

because it had been owned by a "tax exempt nonprofit entity."  Lemp further noted that the building's maximum value, based on the highest and best use of the subject property, would be achieved if it were purchased by a tax exempt nonprofit entity.  However, Lemp discounted the possibility of another tax exempt nonprofit agency purchasing the subject property, comparing that scenario to a "needle in a haystack."  Lemp also discounted the likelihood that the subject property would be purchased by another owner-occupant.  These opinions undoubtedly influenced the low market value that Lemp ascribed to the subject property.

Lemp made several adjustments to the comparable sales in his appraisal.  One such adjustment was occupancy.  Lemp assigned a 15% rate of occupancy to the subject property, which represented the rate of occupancy after CSLF vacated the building, not on the date that the property vested in the plaintiff.  The occupancy rate also affected Lemp's discounted cash flow analysis, which is designed to reflect how much net income would be available to a potential investor.  A discounted cash flow analysis influences the price that a potential investor will pay for a particular piece of property.  The larger the vacancy factor, the lower the price that a potential investor would be willing to pay for the property.  Lemp's discounted cash flow analysis is predicated on a 15% occupancy rate for the subject property.  On the date that the property vested in the plaintiff, however, CSLF remained an

occupant. With CSLF still located on the premises, the occupancy rate should have been much higher than 15%. Lemp's use of such a low occupancy rate undoubtedly contributed to the low market value that he ascribed to the subject property.

Indeed, if an owner-occupant purchased the property and occupied the building in a similar fashion as CSLF, the vacancy factor would be much lower. In this way, Lemp failed to account for the possibility that an owner-occupant could purchase the subject property and occupy it just as CSLF had for more than twenty years. Lemp's failure to account for this possibility -- the occurrence of which would likely reflect the highest and best use for the property -- seems to have played a substantial role in driving down his estimate of the subject property's market value.

**B.   Arnold J. Grant for the Defendant**

Appraiser Grant has been a commercial real estate appraiser since the mid-1970's. He opened his own appraisal firm in 1981. Grant appraised the subject property in February 2009. At that time, he concluded that it was worth $5,100,000 if owned or occupied by a taxpaying entity, and $5,700,000 if owned or occupied by a tax-exempt entity. In September 2009, Grant appraised the subject property once more, seeking to estimate its value on September 18, 2009 -- the day on which the property's title vested in the plaintiff. After reconciling the sales approach and the income capitalization approach, Grant concluded that the market

9

value of the subject property on September 18, 2009 was $5,315,000.

At the evidentiary hearing on April 6, 2009, Grant distinguished between a discounted cash flow analysis and a direct income capitalization analysis. A discounted cash flow analysis, such as the one that Lemp employed in his appraisal report, attempts to forecast discrete income and expenses over a specified holding period. A direct income capitalization analysis, by contrast, assumes a stable occupancy for the property and divides by a capitalization rate. In effect, the appraiser divides the property's net operating income by the capitalization rate in order to estimate its market value.

The advantage of the income capitalization method, according to Grant, is that ownership of the subject property will change in the near future. Consequently, it would be difficult to accurately forecast figures such as occupancy rates, income, and expenses over the next several years as part of a discounted cash flow analysis. Moreover, an income capitalization analysis is easier to understand. In fact, it is how many real estate investors routinely analyze property values.

Grant placed great emphasis on the history and nature of the subject property. He noted that CSLF built the property to serve as an owner-occupied building, and that the subject property did, in fact, serve as such for the past twenty years. Coupled with the weak commercial real estate marketplace conditions in September

2009, the history and nature of the building suggest that the most likely buyer of the subject property would an owner-occupant. In other words, the most likely purchaser would be an entity similar to CSLF. Two things increase the likelihood of this scenario. First, it would be easier for an owner-occupant to finance the purchase of the subject property than any other type of buyer. Second, an owner-occupant would avoid some of the expenses that a traditional investor would incur. As a result, an owner-occupant could afford to pay a higher price. Grant concluded that it is "more likely, more probable" that an owner-occupant would purchase the subject property.

Grant's income capitalization approach therefore assumes that an owner-occupant would purchase the subject property and occupy a large percentage of its open space. This approach suggests that the building would develop significant amounts of income in the short term, since the owner would not incur any leasing expenses. In this way, Grant's approach contrasts sharply with Lemp's, who holds a more "pessimistic" view that a buyer likely would not occupy a "big block of space."

In addition to his income capitalization approach, Grant also evaluated each of the comparable sales that Lemp used in his report. Regarding the 20 Security Drive property, Grant disagrees with Lemp in that the $42 nominal sales price per square foot is "not a market sales price" because it is "at odds with every other

market observation." In fact, Lemp's other comparable sales range from $73 per square foot of GBA to $90 per square foot of GBA. In comparison to these other properties, Grant testified that the $42 figure for 20 Security Drive is almost unheard of in the marketplace.

Grant then explained, in detail, precisely why 20 Security Drive is not useful as a comparable sale. The nominal sale price of the property was $4,327,207. At the time of sale, the mortgage balance was $4,077,207 and the interest rate was 17% per annum. The 20 Security Drive property was therefore sold for the existing mortgage debt plus $250,000. Yet the interest rate on the existing mortgage was 17% which, as Grant points out, does not reflect typical marketplace financing. In fact, it had been negotiated in 1984 as part of the mortgage agreement, under which the mortgage effectively cannot be prepaid. Consequently, the sale of 20 Security Drive was at a relatively low *nominal price* at $42 per square foot of GBA, but the property has a low *nominal value* because of the "onerous obligations" that the buyer was forced to undertake to make the mortgage payments at 17% interest. This contrasts with the opposite scenario, where a sale will be made at a high price per square foot, which means that the mortgage interest rates will be lower so that it is easier for the buyer to make the mortgage payments. The bottom line, according to Grant, is that a property value is suspect on its face if it is associated

with odd financing.

Grant also questioned aspects of Lemp's other comparable sales.  Regarding 17 Talcott Notch Road, Grant noted that the racquetball court and the showroom render the building less attractive in a typical office setting.  In addition to being less attractive, the building would also force the purchaser to incur conversion costs due to such atypical improvements.  Regarding 160 Bridge Street in East Windsor, Grant noted that Rocky Hill is a superior location to East Windsor.  In fact, because it is situated in the northern tier of the Greater Hartford market, 160 Bridge Street is located in a town that is "traditionally thought of as the weakest market."  Consequently, buildings in Rocky Hill will command higher rents and thus higher property values at a higher unit sale price.

86 Hopmeadow Street in Simsbury suffers from a similar problem as the East Windsor property; namely, the location is "below average with respect to location, and also highway access."  Indeed, the subject property is "better because it's closer to the highway, it's closer to a greater concentration of office use."  Finally, regarding 43 Western Boulevard in Glastonbury, Grant applied a positive adjustment to the sale price for two reasons. First, Grant assumed that the property would be 100% vacant. During the sale negotiations, the buyer was told that Amica -- the previous occupant of the building -- would leave.  The buyer

13

purchased 43 Western Boulevard, therefore, based on the understanding that the building would be 100% vacant.  Thus, it is important to note that the sales price did not change when Amica changed its mind and decided to remain the sole occupant of the building.  This means that the sales price of 43 Western Boulevard "is indicative of a hundred percent vacant space," and that is why Grant assumed the property to be completely vacant.  Second, 43 Western Boulevard features an inefficient interior layout.  Grant indicated that such a layout makes it difficult to lease space within the building and then convert it to multi-tenant use.

In addition, the 43 Western Boulevard property offered a slightly larger land-to-building ratio than the subject property.  It is also slightly older than the subject property, so the subject property is physically superior and, therefore, more valuable.  Grant assumed that "there was a good probability that [the subject property] would be owner occupied" so that the buyer would occupy a major portion of the space within the building.  Grant made this assumption because "historically that's the way it had been operated, and given today's market conditions, I think that's most likely."  This would "tend to increase the valuation" because an owner-occupant would avoid the large, immediate vacancies that tend to lower property value.  It would also allow the buyer to avoid paying leasing commissions and other costs associated with leasing the property, such as capital costs for bringing in new tenants.

Grant admitted that a small percentage of his property sales are owner-occupied, or become owner-occupied after the sale is completed. Nevertheless, he stood by his assumption that the subject property would be sold to a buyer who would also occupy it. Grant reasons that this is a logical assumption because the building has been owner-occupied for its entire existence prior to September 18, 2009. Besides, Grant testified, it would be difficult to finance the building under existing marketplace conditions if the buyer didn't occupy a major portion of it: "Only a fool would sell it for peanuts if they could be a little patient and sell it for the full market value." Indeed, the full market value is attainable because "it's probable that an owner-occupant would seek that kind of [fairly open] floor space. That's what the building was designed for."

**C.   The Court's Valuation**

The plaintiff's expert valued the subject property at $2,925,000. The defendant's expert valued the subject property at $5,315,000. The Court concludes that these two figures represent both ends of the spectrum of values that the subject property could reasonably be worth. The Court further concludes that the sales comparison approach is the easiest and most useful approach for valuating the subject property. It appears to be the most consistent and reliable indicator of value, considering the large number of variables that, by definition, must be estimated and

analyzed using the income capitalization approach.

Primarily relying upon the sales approach, the Court finds that the sale at 160 Bridge Street in East Windsor is the most comparable sale to the subject property. The subject property was built in 1988 and 160 Bridge Street was built in 1984. The subject property contains 64,233 square feet of net rentable area and 160 Bridge Street contains 58,733 square feet of net rentable area. Although the experts seem to agree that Rocky Hill is a superior location to East Windsor, both properties are located directly adjacent to Interstate 91, so the 160 Bridge Street property is more comparable to the subject property than those located in Simsbury, Avon, Farmington, and Glastonbury. Moreover, both the subject property and 160 Bridge Street feature one building with three stories, including a level that is partially below grade.

It is true, as Grant testified, that Rocky Hill is a superior location that typically commands higher rents and a higher unit sale price. It is also true that the 160 Bridge Street building needs a new roof, a requirement that lowered its sale price in June 2008 from $4,750,000 to $4,600,000. However, it is in "overall average condition," which is similar to the condition of the subject property, which Lemp described at various times as "fair" and "average to good." In addition, the 160 Bridge Street property, much like the subject property, is not subject to any odd financing terms that would substantially affect its value. In

fact, aside from the fact that it requires a new roof, the only potentially significant adjustment that must be made are "eight vacant suites that [require] varying levels of tenant improvement," according to Lemp's report.

Although Grant appears convinced that an owner-occupant will purchase the subject property, Grant conceded that only a small percentage of his buildings are owner-occupied or become owner-occupied after the sale. While Lemp's "needle in a haystack" argument may overstate the challenge of finding an owner-occupant to purchase the subject property, it remains a considerable challenge. Accordingly, it is more realistic to assume that the subject property would be sold to a buyer that would occupy a smaller percentage of the rentable space than an owner-occupant. This is further evidence of why the 160 Bridge Street building, which was 60% occupied at the time of its purchase, is the most similar property to the subject property.

Taking into account all of the aforementioned evidence, including the subject property's superior location to the 160 Bridge Street property, as well as the subject property's arguably superior physical condition, the Court concludes that the subject property is worth **$4,800,000.**

**IV. The Standard for the Issuance of a Prejudgment Remedy**

Although the Federal Rules of Civil Procedure govern the conduct of an action in federal court, state law determines when

and how a provisional remedy shall be obtained. See Fed. R. Civ. P. 64; SS&C Technologies, Inc. v. Providence Inv. Mgmt., 582 F. Supp. 2d 255, 257 (D. Conn. 2008) (citing Bahrain Telecommunications Co. v. DiscoveryTel, Inc., 476 F. Supp. 2d 176, 183 (D. Conn. 2007)). Under Connecticut law, a prejudgment remedy means "any remedy or combination of remedies that enables a person by way of attachment, foreign attachment, garnishment or replevin to deprive the defendant in a civil action of, or affect the use, possession or enjoyment by such defendant of, his property prior to final judgment . . . ." See TES Franchising, LLC v. Feldman, 286 Conn. 132, 136-37, 943 A.2d 406, 411 (2008) (citing CONN. GEN. STAT. §52-278a(d) (2008)).  A prejudgment remedy is available if the court finds that "there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff . . . ."  See TES Franchising, 286 Conn. at 137 (citing CONN. GEN. STAT. §52-278d(a)(1) (2008)).

"Proof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair preponderance of the evidence." See Ledgebrook Condo. Ass'n, Inc. v. Lusk Corp., 172 Conn. 577, 584, 376 A.2d 60, 64 (1977)). "The legal idea of probable cause is a *bona fide* belief in the existence

18

of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." See Wall v. Toomey, 52 Conn. 35, 36 (1884). ". . . [P]robable cause is a flexible common-sense standard. . . . [I]t does not demand that a belief be correct or more likely true than false." See New England Land Co., Ltd. v. DeMarkey, 213 Conn. 612, 620, 569 A.2d 1098, 1103 (1990) (citing Texas v. Brown, 460 U.S. 730, 103 S. Ct. 1535, 1543, 75 L. Ed. 2d 502, 514 (1983)). Under this standard, the function of the trial court is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits. See Bank of Boston Connecticut v. Schlesinger, 220 Conn. 152, 156, 595 A.2d 872, 874 (1991).

**V.   Discussion**

The Court has already entered a judgment of strict foreclosure. [See dkt. #36.] Furthermore, the Court has found that a deficiency exists in the amount of **$495,846.89.** Accordingly, the Court finds probable cause that "a deficiency judgment will be rendered and [the] court can make an education prediction as to the probable amount of the deficiency." People's Bank v. Bilmor Building Corp., 28 Conn. App. 809 (1992). In other words, the Court has a *bona fide* belief that there exist facts that would warrant a man of ordinary caution, prudence and judgment to conclude that a judgment will be rendered in favor of the plaintiff

19

in a trial on the merits. See Bank of Boston Connecticut v. Schlesinger, 220 Conn. 152, 156 (1991). Accordingly, the plaintiff's motion for a prejudgment attachment is **GRANTED** in the amount of **$495,846.89.**

## VI. Conclusion

For the foregoing reasons, the plaintiff's motions for a deficiency judgment and for a prejudgment remedy are both **GRANTED** in the amount of **$495,846.89.**

This is not a recommended ruling. This is a pretrial ruling and order that is reviewable under the "clearly erroneous" standard of review. See 28 U.S.C. 636(b)(1)(A); Fed. R. Civ. P. 6 (a), 72 (a); and Rule 72.2 of the Local Rules for U.S. Magistrate Judges. As such, it is an order of the court. See 28 U.S.C. § 636(b) (written objections to ruling must be filed within fourteen days after service of same). Either party may timely seek review of this recommended ruling in accordance with Rule 72 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 72. Failure to do so may bar further review. 28 U.S.C. § 636(b)(1)(B); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

**IT IS SO ORDERED.**

**Dated at Hartford, Connecticut, this 22nd day of June, 2010.**

**/s/ Thomas P. Smith**
**Thomas P. Smith**
**United States Magistrate Judge**